OPINION
Pursuant to Crim.R. 12(J), the State of Ohio appeals the Dayton municipal court's decision suppressing evidence obtained at a driver's license checkpoint conducted by the Dayton Police Department in June of 1998. The State claims the municipal court erroneously concluded that the checkpoint was an unreasonable search and seizure in violation of the United States and Ohio Constitutions.
 FACTS
On June 16, 1998, Defendant-Appellee Magus Orr encountered a driver's license checkpoint conducted by the Dayton Police Department in the vicinity of Hoover and Brooklyn Avenues in Dayton. Orr was subsequently cited for driving without being properly licensed in violation of R.C. § 4507.02(A)(1)., Defendant-Appellee Andre Smith (hereinafter "Andre") was stopped at a driver's license checkpoint conducted by the Dayton Police Department on June 17, 1998, near Lakeview and Adelite Avenues in Dayton. Andre was cited for driving without being properly licensed in violation of R.C. § 4507.02(A)(1), operating a motorcycle without the required endorsement in violation of R.C. § 4507.02(A)(3), driving with expired plates in violation of R.C. § 4503.21, and operating a motorcycle without wearing a helmet as is required for novices pursuant to R.C. § 4511.53.
On June 18, 1998, Defendant-Appellee Kevin Smith (hereinafter "Kevin") was driving westbound on Cornell Street when he spotted a driver's license checkpoint being operated by the Dayton Police Department. Approximately one hundred yards before the checkpoint, Kevin stopped his car, drove it in reverse eastbound in a westbound lane on Cornell Street for a distance of about one to two hundred feet, then backed into a driveway and pulled out onto Cornell Street heading away from the checkpoint. All of this took place in plain view of Dayton Police Officer Terry Zimmerman who was one of the officers on duty at the checkpoint. Zimmerman followed Kevin to his residence and cited him for driving without being properly licensed in violation of R.C. § 4507.03(A)(1), failing to pay a reinstatement fee in violation of R.C. § 4507.02, and driving while under suspension in violation of R.C.G.O. § 71.19.
Orr, Andre (hereinafter "Appellees")[1], and Kevin entered pleas of not guilty at their arraignments. In addition, each filed a motion to suppress claiming his seizure was unconstitutional under both the United States and Ohio Constitutions, and that all evidence obtained as a result of his seizure should consequently be suppressed. A hearing was held on August 31, 1998, after which the trial court sustained Appellees' and Kevin's motions to suppress. The State's timely notices of appeal followed, and in a November 23, 1998, decision and entry, we granted the State's motion to consolidate the three cases.
A. Kevin Smith
Upon complete review of the record, we find it necessary to distinguish Kevin's case from those of the other two. Although the State has not raised the issue, we find sua sponte that Kevin cannot claim standing to challenge the constitutionality of the driver's license checkpoint. See Warren County Park Dist. v.Warren County Budget Com'n (1988), 37 Ohio St.3d 68 (raising the issue of an appellant's standing sua sponte). It is well settled that Fourth Amendment rights are personal and, thus, may not be vicariously asserted. Rakas v. Illinois (1978), 439 U.S. 128,133-134. The circumstances leading up to Kevin's being stopped by Officer Zimmerman are somewhat analogous to those of the defendant in a Nebraska case, wherein the Nebraska Supreme Court reasoned as follows:
 While there may be nothing suspicious in making a lawful right turn onto an existing roadway or in making a lawful U-turn before reaching a roadblock, we are persuaded that the conservation officer's observation of Giessinger's actions in driving the pickup onto the shoulder of the highway and switching places with the passenger prior to approaching the roadblock was sufficient to provide the officer with the reasonable suspicion necessary to justify the investigatory stop. That is to say, Giessinger's actions provided a basis independent of the roadblock which justified his stop.
 Thus, we do not reach the question whether the roadblock was lawful, for while Giessinger has standing to challenge the seizure of the vehicle in which he was riding, he does not have standing to challenge the seizure of other vehicles pursuant to the roadblock.
State v. Giessinger (Neb. 1990), 454 N.W.2d 289, 294. See alsoMurphy v. State (Tex.App. 1992), 864 S.W.2d 70, 77 (finding appellant lacked standing to challenge constitutionality of roadblock under nearly identical circumstances). The Nevada court's reasoning is persuasive.
In Kevin's case, according to Officer Zimmerman's uncontroverted testimony, Kevin committed a traffic violation which provided a justification for pursuing and citing him independent of the checkpoint by driving backwards eastbound in a westbound lane of traffic. Since Kevin never reached the checkpoint, and because his conduct gave Officer Zimmerman an independent reason for pursuing and citing him, he does not have standing to challenge the constitutionality of the checkpoint program. Therefore, we find the trial court erred in sustaining Kevin's motion to suppress on grounds that the checkpoint was unconstitutional. Accordingly, we reverse the decision of the trial court as to Kevin Smith and remand for further proceedings. The remainder of this opinion consequently applies only to Magus Orr's and Andre Smith's cases.
B. The Checkpoints
At the suppression hearing, Lieutenant John Bardun III of the Dayton Police Department testified that he acted as commander of the checkpoint program during its development and operation. Pursuant to directions from Deputy Chief of Police Lieutenant Colonel John Compston, Bardun researched checkpoint programs in other jurisdictions. With the information gleaned from his research, and guidance from Dayton's legal director via a legal opinion, Bardun developed guidelines, which are neither at issue nor necessary to reproduce for present purposes.
Lieutenant Bardun testified that the primary function of the checkpoints was to check for individuals driving without a valid license, although he was aware of no correlation between a motorist's safe operation of a motor vehicle and his or her licensure through the Bureau of Motor Vehicles. Bardun also identified a secondary function which he described as a belief in the police department that the checkpoints would "have positive affects on crime rate and — umm — order maintenance." Tr. at 19.
Locations for the driver's license checkpoints were selected after input was had from the various District Commanders and the Assistant Chief of Police. Among the criteria considered in the site selection process were safety and traffic volume. Although Bardun referred to "target enforcement areas" in his testimony, he also acknowledged that no statistical analysis had been performed to determine whether or where within the city limits there might be a higher concentration of unlicensed drivers or drivers whose licenses had been revoked or suspended. Instead, the "target enforcement areas" were selected on the basis of their traffic and crime problems as indicated by the district commanders, and the history and frequency of radar and/or laser units being placed at the site. In the end, two or three checkpoints were set up in each of the First, Second, Third, and Fifth Districts, but none were conducted in the Central Business District due to inclement weather.[2]
Upon arrival at the checkpoint site, participating officers would set up reflective signs measuring approximately three feet by three feet which warned drivers of the upcoming checkpoint. The signs were placed about one hundred yards before the checkpoint. At some of the checkpoint sites, motorists had an opportunity to avoid the checkpoint by turning onto a side street or making a legal U-turn; others provided no such opportunity. Although Lieutenant Bardun stated motorists who turned onto a side street before reaching the checkpoint were never pursued, he also testified that on at least some occasions, "where [the motorist] would turn the officers would follow them, run the registration, [and] see if there was some other reason to stop them." Tr. at 13.
The checkpoints were staffed by Lieutenant Bardun, a supervisor, and nine or ten officers, and were operated between the hours of 6:00 p.m. and 2:00 a.m. Generally, every car was directed through each checkpoint during its operation, unless the flow of traffic made it unsafe to do so. In that case, pattern stops in which every third, fourth, or fifth car would be directed to the checkpoint while the rest were waived through would be instituted as ordered by the scene commander, Lieutenant Bardun. Deviation from the pattern was permitted only for safety reasons, and lasted only so long as the safety risk persisted. The average length of detention for those motorists possessing a valid license was forty-five seconds, according to Lieutenant Bardun. For those stopped at the checkpoint without their driver's license, the officers entered their names, dates of birth, and social security numbers into the KDT computers to check for a valid license which took an additional two minutes or so to complete. Provided the computer showed the motorist was properly licensed and was not wanted by the police for any other reason, he or she was given a pamphlet explaining the driver's license checkpoint program and was then free to go on his or her way. Individuals found driving after their license had expired were cited, which added approximately ten minutes to the length of their detention.
In all, over 2,100 cars were stopped, 224 traffic citations were issued, and 159 people were arrested as a result of the checkpoints. Like Appellee Andre Smith herein, however, some people received more than one citation, and Lieutenant Bardun was unable to state how many of the citations and/or arrests were for violations related to driver's licenses.
Officer Terry Zimmerman also testified at the suppression hearing, describing in detail the circumstances surrounding his pursuit and citation of Kevin Smith. Because we have found that Kevin Smith does not have standing to challenge the constitutionality of the checkpoint program, supra, we have no need to go into Officer Zimmerman's testimony to any greater degree than we have already.
 II. THE TRIAL COURT'S RULING ON APPELLEES' MOTIONS TO SUPPRESS
In granting the Appellees' motions to suppress, the municipal court reasoned as follows:
 There is no doubt that the government has a vital interest in ensuring that only those qualified to do so are permitted to operate motor vehicles. Obviously, the state is concerned with roadway safety. However, the state presented no statistical evidence to show the number of accidents or fatalities caused by unlicensed drivers in contrast to those caused by licensed drivers. There was no evidence which indicated that unlicensed drivers posed more of a danger to others on the road than licensed drivers. Among the innumerable reasons that a person may not be properly licensed, many of the reasons are totally unrelated to one's ability to drive. A motorist in Ohio may have been properly tested and licensed but possess a suspended license for failure to pay a traffic ticket, a reinstatement fee, a ticket in another state, or failure to file an accident report, for example.
* * *
 [T]here was no empirical evidence which indicated that drivers' license checkpoints would be an effective means of promoting roadway safety.
* * *
 There was no evidence that the roadblock was a necessary tool for law enforcement * * * [or] that the officers were more efficient than they would have been had they been on routine patrol * * *.
 The court consequently concluded that the State's primary interest in establishing the checkpoints was the apprehension of unlicensed drivers, not promoting roadway safety, and that as such, the checkpoints constituted an unreasonable search and seizure in violation of the United States and Ohio Constitutions.
The State's appeal assigns three errors. First, it claims its interest in keeping unlicensed drivers off the road justifies the intrusion on motorists' Fourth Amendment interests. Next, it argues the absence of statistical support for its contention that unlicensed drivers present a greater threat on the road than do licensed drivers does not weaken its significant interest in roadway safety and the integrity of the driver's licensing scheme. Finally, the State claims the trial court erroneously usurped the power of those charged with allocating police resources by determining that the checkpoint program was an unnecessary and inefficient tool of law enforcement.
 III. BACKGROUND
Preliminarily, we note that constitutional analysis is a question of law which we review de novo. State v. Ziepfel (1995),107 Ohio App.3d 646, 652. See also Ornelas v. United States
(1996), 517 U.S. 690, 698-99 (stating legal conclusions of trial court are reviewed de novo); State v. Musick (1997), 119 Ohio App.3d 361,367 (noting that trial court's application of substantive constitutional law is subject to de novo review); and State v. Cossin
(1996), 110 Ohio App.3d 79, 81 (stating questions of law are reviewedde novo).
The question of the constitutionality of driver's license checkpoints has not been addressed by our supreme court. We note, however, that the appellate courts of this state have had several opportunities to consider the constitutionality of checkpoints or roadblocks set up for purposes such as checking for valid driver's licenses, sobriety, drug trafficking, and automobile safety equipment. Those cases, as well as the United States Supreme Court cases and the cases from other states pertaining to checkpoints are enlightening and useful to our analysis. Thus, before continuing on to the merits of the Appellees' assignments of error, we give an overview of the current state of the law as it relates to checkpoints.
A. United States Supreme Court Cases
The right of the people to be free from unreasonable searches and seizures is guaranteed both by the Fourth Amendment to the United States Constitution, which is applicable to the states via the Fourteenth Amendment, Mapp v. Ohio (1961), 367 U.S. 643, 669;Ker v. California (1963), 374 U.S. 23, 30, and by Section 14, Article I, of the Ohio Constitution.[3] The Supreme Court of Ohio has recently examined the constructive and substantive similarities between the Fourth Amendment and its counterpart in the Ohio Constitution, stating as follows:
 The language of Section 14, Article I of the Ohio Constitution and the Fourth Amendment is virtually identical. [Footnote omitted.] Accordingly, this court has interpreted Section 14, Article I of the Ohio Constitution as affording the same protection as the Fourth Amendment.
* * *
 [T]his court in State v. Geraldo (1981), 68 Ohio St.2d 120, 125-126, stated:
 "The question is whether this court should imbue the state constitutional provisions regarding search and seizure with a more stringent standard of reasonableness than is required by the cognate federal constitutional provisions. * * * [W]e are disinclined to impose greater restrictions in the absence of explicit state constitutional guarantees protecting against invasions of privacy that clearly transcend the Fourth Amendment. * * * It is our opinion that the reach of Section 14, Article I, of the Ohio Constitution * * * is coextensive with that of the Fourth Amendment." See, also, State v. Andrews (1991), 57 Ohio St.3d 86, 87, fn. 1. [Parallel cites omitted.]
 Thus, case law indicates that * * * we should harmonize our interpretation of Section 14, Article I of the Ohio Constitution with the Fourth Amendment, unless there are persuasive reasons to find otherwise.
State v. Robinette (1997), 80 Ohio St.3d 234, 238-39. We are guided, nay bound, by the words of the Ohio Supreme Court as we proceed to our analysis of the City's assignments of error.
"Although the fourth amendment protects only reasonable expectations of privacy, * * * a motorist surrenders neither his reasonable expectations of privacy nor the protections of thefourth amendment when he steps into his automobile." State v.McLaughlin (Ind.App. 1984), 471 N.E.2d 1125, 1130 (overruled on other grounds, State v. Garcia (Ind. 1986), 500 N.E.2d 158, 162), citing Katz v. United States (1967), 389 U.S. 347, 351-53, andDelaware v. Prouse (1979), 440 U.S. 648, 662-63. It is well-settled law that a seizure within the meaning of theFourth Amendment occurs whenever a vehicle and its driver is detained by law enforcement officers, regardless of the detention's brevity.Prouse, supra at 653. That is not to say, however, that a warrant, or probable cause, or even reasonable and individualized suspicion must always be present for such a seizure to comport with the Fourth Amendment.
The Supreme Court has distinguished stops effected by roving patrols from checkpoint stops with regard to the need for some individualized suspicion of wrongdoing. In United States v.Brignoni-Ponce (1975), 422 U.S. 873, for example, the Court considered the constitutionality of suspicionless stops by roving border patrols. There, the defendant was stopped near San Clemente, California by border patrol officers who later stated that their only reason for doing so was because the defendant and his passengers appeared to be of Mexican descent. The Court employed a test for the reasonableness of a seizure it had articulated in Camara v. Municipal Court (1967), 387 U.S. 523,536-37, in which the government's need to search is balanced against the invasion of the individual's right to be free from arbitrary interference by law enforcement officers. Although the Court found the public interest in preventing illegal aliens from entering the country to be valid and the intrusion modest, it concluded that warrantless seizures by roving patrols, unaccompanied by reasonable suspicion or probable cause, were constitutionally impermissible. See also Almeida-Sanchez v.United States (1973), 413 U.S. 266 (holding search of automobile by roving border patrol officers unconstitutional in the absence of probable cause or consent).
 In United States v. Martinez-Fuerte (1976), 428 U.S. 543, the Court upheld the warrantless detention of a motorist detained without probable cause or reasonable suspicion at a permanent checkpoint established for the purpose of detecting and intercepting smugglers and illegal immigrants near our nation's border with Mexico. Again the Court balanced the public interest served by the seizure against the individual's right to personal security free from arbitrary interference by law enforcement officers. The Court noted that the public has a substantial interest in apprehending and deterring smugglers and illegal aliens from using the highways on which checkpoints are located. Martinez-Fuerte, supra at 556-57. In addition, to avoid the checkpoint, those involved in transporting illegal aliens into the country would necessarily be forced onto less-traveled roads causing them to be more easily detected by roving patrols. Id. at 557. The Court also explained that because no search of the vehicle or its occupants was performed, which effectively limited the officers' inspection to whatever might be in plain view, the "objective intrusion," defined by the Court as "the stop itself, the questioning, and the visual inspection," was minimal. Id. at 558. Further, the "subjective intrusion," consisting of "the generating of concern or even fright on the part of lawful travelers," was not as great when a stop is effected by way of a checkpoint rather than a roving patrol because, the Court reasoned, motorists could see that other vehicles were being stopped and would be reassured by the "visible signs of the officers' authority." Id. Moreover, the checkpoint stop at issue in Martinez-Fuerte, unlike the roving patrol stop in Brignoni-Ponce, curtailed the border patrol officers' discretion since its location was selected by administrative officials responsible for allocating limited enforcement resources, rather than the officers in the field. Although the Court acknowledged the existence of other law enforcement mechanisms used by the border patrol in controlling the influx of illegal aliens from Mexico, specifically temporary checkpoints and roving patrols, it took pains to limit its holding to permanent checkpoints, explicitly stating that "[w]e are concerned here with permanent checkpoints." Id. at 553. In a footnote, the Court made mention of checkpoints established for purposes other than the interception of illegal aliens as follows:
 Stops for questioning, not dissimilar to those involved here, are used widely at state and local levels to enforce laws regarding driver's licenses, safety requirements, weight limits, and similar matters. The fact that the purpose of such laws is said to be administrative is of limited relevance in weighing their intrusiveness on one's right to travel; and the logic of the defendants' position [that some quantum of individualized suspicion is usually a prerequisite to a constitutional search or seizure], if realistically pursued, might prevent enforcement officials from stopping motorists for questioning on these matters in the absence of reasonable suspicion that a law was being violated. As such laws are not before us, we intimate no view respecting them other than to note that this practice of stopping automobiles briefly for questioning has a long history evidencing its utility and is accepted by motorists as incident to highway use.
 Id. at 560, fn. 14. As if there were any doubt remaining about the scope of the Court's ruling, in another footnote it stated the following:
 Our holding today, approving routine stops for brief questioning (a type of stop familiar to all motorists) is confined to permanent checkpoints. We understand, of course, that neither long-standing congressional authorization nor widely prevailing practice justifies a constitutional violation.
Id. at 566, fn. 19.
A few years later, the Court decided a case involving a police officer's roving stop of a vehicle for the purpose of checking the driver's license and automobile registration.Delaware v. Prouse (1979), 440 U.S. 648. In balancing the government's legitimate interests in ensuring the safety of its roadways against the intrusion on the privacy and security of motorists per the Camara test for reasonableness, the Court found such stops to be unconstitutional. It reasoned that in spite of the government's vital interest in assuring that only licensed drivers take to the roads, the State failed to show that the effectiveness of roving stops as a law enforcement technique was great enough to justify the intrusion on Fourth Amendment interests. Id. at 659. Citing the State's lack of empirical data showing random roving stops to be a productive method of apprehending unlicensed drivers and the lack of proof that such drivers would be deterred by the prospect of being stopped at random by a roving patrol, the Court stated that "[t]he marginal contribution to roadway safety possibly resulting from a system of spot checks cannot justify subjecting every occupant of every vehicle on the roads to a seizure — limited in magnitude compared to other intrusions but nonetheless constitutionally cognizable — at the unbridled discretion of law enforcement officials." Id. at 661. In dictum, however, the Court noted that other less intrusive means of detecting unlicensed drivers that also curtail the law enforcement officers' discretion might be developed by the State. It suggested that "[q]uestioning of all oncoming traffic at roadblock-type stops is one possible alternative." Id. at 663.
It was not until Michigan Dept. of State Police v. Sitz
(1990), 496 U.S. 444, that the Supreme Court addressed the propriety of temporary checkpoints, though even then, it was in the context of a sobriety checkpoint rather than one established for the purpose of checking motorists' driver's licenses. In weighing the balancing factors as articulated in Brown v. Texas
(1979), 443 U.S. 47, the Court noted that the seriousness and magnitude of the problems caused by drunken drivers was not subject to serious dispute. Sitz at 451. In addition, the "objective" intrusion attending the sobriety checkpoint in Sitz
was found to be slight and indistinguishable from that accompanying the illegal alien checkpoint in Martinez-Fuerte. Remarking that the Sitz checkpoint was operated according to guidelines created by an advisory committee detailing the procedure to be used at the checkpoint, selection of its location, and any publicity, and that it was conducted by uniformed officers who briefly stopped every approaching vehicle, the Court found the "subjective" intrusion there to be no greater than what was present in the illegal alien checkpoints upheld inMartinez-Fuerte.
B. Cases in Other States
Most states have found the general concept of checkpoints established to deter and apprehend drunk drivers to be constitutional under both the federal and their state constitutions. See English, Comment, Sobriety Checkpoints Under State Constitutions: What has happened to Sitz? (Winter 1998), 59 U. Pa. L. Rev. 453, 462-63, fn. 67 and accompanying text (listing thirty-one states that have upheld the constitutionality of sobriety checkpoints). It has been noted that the depth of analysis in cases affirming roadblocks or checkpoints varies greatly. McLaughlin, supra at 1135. In fact, some have relied almost exclusively on the Supreme Court's suggestion in the Prousedictum that such stops might be constitutional if all approaching vehicles were to be stopped. Id. On the other hand, several states have relied on their state constitutions to find such stops unconstitutional. English, supra, (listing eight states holding sobriety checkpoints unconstitutional under state constitution).[4] Many states have been reluctant to distinguish sobriety checkpoints from checkpoints conducted, at least in part, to verify driver's licenses in any meaningful or outcome-altering way. See LaFontaine v. State (Ga. 1998),497 S.E.2d 367 (relying on Sitz in finding driver's license, insurance, and "other violations" checkpoint constitutional);State v. Grooms (N.C.App. 1997), 483 S.E.2d 445, 446 (citing government's interest in "getting drunks off the road, recover stolen vehicles and find persons not served with outstanding warrants or summons" in upholding checkpoint designed to check driver's licenses, execute outstanding warrants, and intercept stolen vehicles); State v. Barker (Kan. 1993), 850 P.2d 885, 887
(holding checkpoint designed to check driver's licenses and "reduce accident-related causative factors" constitutional);Commonwealth v. Blouse (Pa. 1992), 611 A.2d 1177 (stating the rationale behind upholding sobriety checkpoints applies equally to statutorily authorized driver's license/registration/equipment checkpoints).
The weight of authority among the state courts is that checkpoints for license and registration are not per se violations of the constitutional rights of motorists. Courts in at least twenty-four states and the District of Columbia have upheld some form of license and registration roadblock. See McInnish v. State
(Ala.Cr.App. 1991), 584 So.2d 935; Camp v. State (Ark.App. 1989),764 S.W.2d 463; People v. Alvarez (Cal. 1996), 926 P.2d 365; Peoplev. Andrews (Colo. 1971), 484 P.2d 1207; Howard v. Voshell
(Del.Super. 1992), 621 A.2d 804; Duncan v. United States
(App.D.C. 1993), 629 A.2d 1; Rennard v. State (Fla.App. 1996),675 So.2d 1006; LaFontaine v. State (Ga. 1998), 497 S.E.2d 367; Peoplev. Bartley (Ill. 1985), 486 N.E.2d 880; State v. Loyd (Iowa 1995),530 N.W.2d 708; State v. Barker (Kan. 1993), 850 P.2d 885; Kinslowv. Commonwealth (Ky.App. 1983), 660 S.W.2d 677; State v. Cloukey
(Me. 1985), 486 A.2d 143; Miller v. State (Miss. 1979),373 So.2d 1004; State v. Severance (N.H. 1968), 237 A.2d 683; State v.Kabayama (N.J.Super. 1967), 226 A.2d 760, affirmed without opinion by (N.J. 1968), 246 A.2d 714; State v. Valencia-Olaya
(N.M.App. 1987), 736 P.2d 495; State v. Grooms (N.C.App. 1997),483 S.E.2d 445; State v. Wetzel (N.D. 1990), 456 N.W.2d 115; State v.Shankle (Or.App. 1982), 647 P.2d 959; Commonwealth v. Blouse
(Pa. 1992), 611 A.2d 1177; Murphy v. State (Tex.App. 1992),864 S.W.2d 70; Lowe v. Commonwealth (Va. 1985), 337 S.E.2d 273; Statev. Davis (W.Va.App. 1995), 464 S.E.2d 598. At least three federal circuit courts of appeal have also upheld the constitutionality of license and registration checkpoints. See United States v.Trevino (C.A.7, 1995), 60 F.3d 333; United States v. Prichard
(C.A.10, 1981), 645 F.2d 854; United States v. McFaydon
(C.A.D.C. 1989), 865 F.2d 1306.
High courts in six states have held that the DWI checkpoints found constitutional by the Supreme Court in Sitz violated particular provisions of their state constitutions. State v.Church (La. 1989), 538 So.2d 993; Sitz v. Dept. of State Police
(Mich. 1993), 506 N.W.2d 209; Ascher v. Commr. of Public Safety
(Minn. 1994), 519 N.W.2d 183; State v. Koppel (N.H. 1985),499 A.2d 977; Pimental v. Dept. of Transp. (R.I. 1989), 561 A.2d 1348;Seattle v. Mesiani (Wash. 1988), 755 P.2d 775. In most of those states, presumably, checkpoints for drivers' licenses would also be found unconstitutional. Of those courts, however, one, the New Hampshire Supreme Court, has held that DWI checkpoints are more constitutionally offensive than license checkpoints, which the court had previously upheld. See Koppel, 499 A.2d at 980, distinguishing State v. Severance (N.H. 1968), 237 A.2d 683. InKoppel, the New Hampshire court reiterated the position it adopted in Severance that license checkpoints are a reasonable means of enforcing a legitimate state interest, particularly because, without such checkpoints, most violations are undetectable. Id.
C. Ohio Cases
In Ohio, the cases have generally mirrored the reasoning of the Supreme Court cases above, distinguishing roving stops from checkpoint stops, and placing emphasis on the degree of the field officers' discretion in determining which motorists would be stopped and the extent of their inquiries after the stop. SeeState v. Eggleston (1996), 109 Ohio App.3d 217 (finding sobriety checkpoint constitutional after weighing state's interest against level of intrusion and after careful consideration of checkpoint's procedures, operation, and effectiveness); State v. Bauer (1994),99 Ohio App.3d 505 (same); State v. Myers (1990), 63 Ohio App.3d 765
(recognizing that roving patrol officers must have "some articulable and reasonable suspicion" that vehicle is unsafe before detaining driver); City of Ironton v. Murnahan (1987),43 Ohio App.3d 91 (applying Prouse and finding stop by roving patrol to check for curfew, safety, and seat belt violations was unconstitutional); State v. Goines (1984), 16 Ohio App.3d 168
(relying on Prouse and Martinez-Fuerte and upholding constitutionality of safety equipment checkpoint on grounds that field officer's discretion was limited); State v. Graham (Nov. 1, 1990), Cuyahoga App. No. 57622; unreported (considering procedures, operation, and effectiveness of drug trafficking roadblock and finding it constitutional after applying Brown
balancing test); State v. Brown (Dec. 30, 1993), Lucas App. No. L-93-094, unreported (holding sobriety checkpoint constitutional as implemented and operated); State v. Kelley (Apr. 13, 1994), Greene App. No. 93-CA-57, unreported (relying on Sitz in evaluating sobriety checkpoint procedures); State v. Blackburn
(Mar. 23, 1994), Clark App. No. 3084, unreported (closely examining the effectiveness and procedures employed at sobriety checkpoint and holding it to be unconstitutional).
One relatively early court of appeals case has involved a checkpoint set up solely for the purpose of checking driver's licenses. See City of Cuyahoga Falls v. Church (1967), 10 Ohio App.2d 9. There, however, the court spent little time analyzing the constitutionality of the checkpoint itself. Instead, the court stated the following:
 As an indication of the extent to which a motorist must submit to the lawful demands of an officer to determine such motorist's right to exercise his license to operate a motor vehicle on the public highway, we cite the case of Schmerber v. State of California, 384 U.S. 757 [parallel cites omitted], decided June 20, 1966, by the Supreme Court of the United States, wherein that court found that a defendant's constitutional rights had not been violated by a compulsory blood test, and the admission of the evidence thereof at trial for driving a motor vehicle while intoxicated. (Cites omitted.)
Church, supra at 10.
 IV. THE ASSIGNMENTS OF ERROR
In its first assignment of error, the State argues that the trial court erred in finding the driver's license checkpoints unconstitutional. Specifically, the State claims that the constitutionality of the checkpoints is only vulnerable to an attack on the manner in which they are operated. This is so, contends the State, because the United States Supreme Court has determined that checkpoints are not per se violative of theFourth Amendment so long as sufficient limitations are placed on the discretion of the officers on the scene of the checkpoints. In addition, the State argues that the its interest in keeping unlicensed drivers from using the roadways justifies the intrusion on motorists' Fourth Amendment interests. Finally, the State claims that because 7.5% of the motorists stopped at the checkpoints were arrested, the efficiency of the roadblocks in detecting unlicensed drivers cannot be questioned. In the second assignment of error, the State identifies two allegedly erroneous presumptions underlying the trial court's decision: (1) that unlicensed drivers are no greater threat on the road than licensed drivers, and (2) that the government's interest in checking for valid driver's licenses was limited to that of highway safety.
Essentially, the issue presented in the State's first and second assignments of error is whether, in the absence of statistical evidence showing unlicensed drivers to be a grave danger on the road or that unlicensed drivers were likely to be deterred from driving because of the checkpoints, the government's interest or interests in keeping unlicensed drivers off the roads outweighed motorists' Fourth Amendment right to be free from unreasonable seizure. The State contends that its interest in roadway safety was sufficient to justify the checkpoints even without statistical support. Further, it argues that even if that were not so, it also had other interests in conducting the program that were not recognized by the trial court which, when combined with its interest in roadway safety, would unquestionably overcome motorists' Fourth Amendment right to travel the roads unimpeded. We observe that the State does not suggest that the trial court gave undue weight to the Fourth Amendment right at stake. In our analysis, therefore, we will limit our discussion to the government's interest and the proper weight it is to be given. Additionally, although the State uses approximately half of the space devoted to its first assignment of error to defend the guidelines developed for implementing and operating the checkpoints, the trial court found no fault with those procedures. In fact, the court commended the police department on the thoroughness of the guidelines and on the officers' adherence to them. Consequently, our discussion will focus on whether the trial court erred in finding that the government's interest in roadway safety and enforcement of the driver's license law was sufficiently demonstrated at the suppression hearing.
There are actually two components to an evaluation of a government's interest in challenged seizures. One consists of a weighing of the gravity of the public concerns served by the seizure, and the other the degree to which the seizure advances the public interest. Brown v. Texas, 443 U.S. at 50-51. Pertaining to the first of these, we note that in Delaware v.Prouse, supra, the United States Supreme Court acknowledged the government's vital interest in highway safety as follows:
 [W]e are aware of the danger to life and property posed by vehicular traffic and of the difficulties that even a cautious and an experienced driver may encounter. We agree that the States have a vital interest in ensuring that only those qualified to do so are permitted to operate motor vehicles, that these vehicles are fit for safe operation, and hence that licensing, registration, and vehicle inspection requirements are being observed. Automobile licenses are issued periodically to evidence that the drivers holding them are sufficiently familiar with the rules of the road and are physically qualified to operate a motor vehicle. The registration requirement and, more pointedly, the related annual inspection requirement in Delaware are designed to keep dangerous automobiles off the road. Unquestionably, these provisions, properly administered, are essential elements in a highway safety program.
Id. at 658. In the present case, the trial court acknowledged that the government has a vital interest in roadway safety, but concluded that in the absence of any evidence showing that unlicensed drivers are responsible for more traffic accidents or fatalities than licensed drivers, the State had failed to demonstrate by a preponderance of the evidence that the danger presented by unlicensed drivers was, by itself, of such magnitude to justify the intrusion on Fourth Amendment interests inherent in the checkpoints.
There seems little doubt that the United States Supreme Court would find license checkpoints constitutional if properly implemented. The Supreme Court in Delaware v. Prouse, supra,
noted in dicta that although "random" stops by officers to check the licensure of drivers was unconstitutional, states were not precluded from developing methods for spot checks that involve less intrusion or that do not involve the unconstrained exercise of discretion of the police officers. The court noted that the questioning of all oncoming traffic at roadblock-type stops is one possible alternative. 440 U.S. at 663.
Judge Young finds the license checkpoint unconstitutional because the State failed to demonstrate by a preponderance of the evidence that the danger presented by unlicensed drivers was of such a magnitude to justify the intrusion caused by license checkpoints. The Supreme Court in Prouse however noted that states have a vital interest in ensuring that only those qualified to do so are permitted to operate motor vehicles, that the vehicles are fit for operation, and hence licensing, registration, and vehicle inspection requirements are being observed.440 U.S. at 658.
In Michigan Dept. of State Police v. Sitz (1990),496 U.S. 444, the United States Supreme Court held that Michigan's highway sobriety checkpoint program did not violate the Fourth Amendment because the balance of the State's interest in preventing drunken driving, the extent to which the system could reasonably be said to advance that interest, and the degree of intrusion upon individual motorists who are briefly stopped weighed in favor of the state program.
Chief Justice Rehnquist noted at page 453 of the Court's opinion:
 The Court of Appeals went on to consider as part of the balancing analysis the "effectiveness" of the proposed checkpoint program. Based on extensive testimony in the trial record, the court concluded that the checkpoint program failed the "effectiveness" part of the test, and that this failure materially discounted petitioners' strong interest in implementing the program. We think the Court of Appeals was wrong on this point as well.
 The actual language from Brown v. Texas, upon which the Michigan courts based their evaluation of "effectiveness," describes the balancing factor as "the degree to which the seizure advances the public interest." 443 U.S., at 51. This passage from Brown was not meant to transfer from politically accountable officials to the courts the decision as to which among reasonable alternative law enforcement techniques should be employed to deal with a serious public danger. Experts in police science might disagree over which of several methods of apprehending drunken drivers is preferable as an ideal. But for purposes of Fourth Amendment analysis, the choice among such reasonable alternatives remains with the governmental officials who have a unique understanding of, and a responsibility for, limited public resources, including a finite number of police officers. Brown's rather general reference to "the degree to which the seizure advances the public interest" was derived, as the opinion makes clear, from the line of cases culminating in Martinez-Fuerte, supra. Neither Martinez-Fuerte nor Delaware v. Prouse, 440 U.S. 648 (1979), however, the two cases cited by the Court of Appeals as providing the basis for its "effectiveness" review, see 170 Mich. App., at 442, 429 N.W.2d, at 183, supports the searching examination of "effectiveness" undertaken by the Michigan court. (Emphasis ours).
The State of Ohio certainly has an interest in keeping unlicensed drivers off the highway. Persons who are too young or too old to drive pose a threat to the public safety. Persons who have had their licenses suspended for convictions of operating a motor vehicle while under the influence of alcohol often disregard their suspensions and drive anyway endangering the public.
Admitted without objection was the Dayton Police Department's License Checkpoint Guidelines which were approved by the Deputy Chief. (State's Ex. 1). Col. Compston noted that the purpose of the checkpoints was to deter the operation of motor vehicles by unlicensed drivers. He noted that of almost 3.2 million drivers in the State of Ohio, approximately 800,000 have their driver's license under some form of suspension. He also noted that approximately 30% of the traffic citations issued by the Dayton Police Department are for driver's license violations and it is estimated that one in eight drivers in the City of Dayton are unlicensed.
In City of Miami v. Aronovitz (Fla. 1959), 114 So.2d 784, the court noted the following:
 When a license is revoked or suspended it is of major importance that the operator so restricted be prevented from driving an automobile during the penalty period. This is so because otherwise the restriction would be meaningless. Even more important, operators who have been proven to be negligent, incompetent and a public hazard would be in a position to continue operating motor vehicles without fear of apprehension or restraint in the absence of some reasonable inspection system. Consequently, it is very much in the public interest that law enforcement officers be permitted to make periodic check-ups on the driving license qualifications of those who operate motor vehicles on the highways.
In this case command officers at the Dayton Police Department decided that checkpoints were the most effective way to deal with the problem of unlicensed drivers. This certainly was a "reasonable law enforcement technique to deal with a serious public danger."
In State v. Cloukey (Me. 1985), 486 A.2d 143, the Supreme Court of Maine validated license checkpoints and observed at page 146 of the Court's opinion:
 We believe that the State of Maine has a vital interest in protecting its citizens from persons who have either not qualified to drive or who have been declared incompetent to drive because of a record of serious driving offenses. This case does not involve a sobriety stop. There may be many effective ways of detecting a drunken driver without intruding on the rights of the citizen. A trained eye can readily spot erratic operation. The unlicensed driver, however, displays no observable characteristics. If a license check under any circumstances is unreasonable, then in most instances, public protection must await the commission of another offense. Although the state's interest would not sustain the highly intrusive roving stop of a single vehicle, it does sustain the less intrusive police practice employed in this case. (Emphasis ours).
The Supreme Court of New Hampshire reached a similar result in State v. Severance (N.H. 1968), 237 A.2d 683. The court's holding was based on the demonstrable fact that road checks were the only effective means to law enforcement authorities of enforcing license and registration laws. In a per curiam opinion, the supreme court observed:
 The mounting fatality rate in this state, the steadily increasing number of violations involving the operation of motor vehicles without licenses or registration, together with the number of accidents involving unlicensed drivers is a pressing problem which is more than a statistic. "Clearing the highways of irresponsible drivers" is one of the "problems that have taxed the ingenuity of lawmakers and administrators." Calif. Auto Ass'n v. Maloney, 341 U.S. 105, 110. See State v. Despres, 107 N.H. 297, 299. "If stopping motorists indiscriminately by police officers for the good faith purpose of inspecting or asking for the exhibition of a driver's license was not permitted, the licensing law would break down and become a nullity, and the objective for promoting public safety from irresponsible automobile drivers would be seriously impeded. There would be but few occasions when an officer could otherwise learn that the law was being violated." Commonwealth v. Mitchell, 355 S.W.2d 686, 688-689 (Ky.App. 1962).
We are not persuaded by appellees' argument that the command staff of the Dayton Police is not politically accountable for their decision to implement license checkpoints. The command staff is not protected by civil service and is directly accountable to the Dayton City Manager who is directly accountable to the elected City Commission. There is little doubt that if citizens of the City of Dayton thought that license checkpoints were either too burdensome on its citizens or a waste of police resources, they could persuade their elected officials to stop their use.
Lastly, we agree with the State's third assignment that it was not proper for the trial court to substitute its judgment for that of the police department regarding whether the checkpoints were an efficient use of Dayton police officers.
The judgments of the trial court are Reversed and the causes are Remanded for further proceedings consistent with the opinion.
GRADY, P.J., concurs.
[1] Our reason for including only Magus Orr and Andre Smith in "Appellees" will soon be made apparent.
[2] The Dayton Police Department is comprised of five districts, four of them identified numerically as Districts One, Two, Three, and Five, and one identified as the Central Business District. The reason for the conspicuous absence of a Fourth District has apparently been lost to history.
[3] The Fourth Amendment to the United States Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."
 Section 14, Article I of the Ohio Constitution reads as follows: "The right of the people to be secure in their persons, houses, papers, and possessions, against unreasonable searches and seizures shall not be violated; and no warrant shall issue, but upon probable cause, supported by oath or affirmation, particularly describing the place to be searched and the person and things to be seized."
[4] Interestingly, we notice that on remand from the United States Supreme Court, the sobriety checkpoints at issue in Sitz, supra, were declared unconstitutional under the state constitution by the state high court.Sitz v. Dept. of State Police (Mich. 1993),506 N.W.2d 209.